## Voorhees and others *v*. De Myer.

Where parties contract for the sale of land, for a gross sum or price, under a mutual mistake as to the quantity contained in the parcel sold, believing it to contain about a fourth more than its actual contents, and the vendee has taken possession, made valuable permanent improvements, and paid nearly all the price ; equity will compel the vendor to convey the land actually owned by him, with a rateable deduction from the price for the deficiency.

D. sold to G. by an executory contract, two lots of wild land, which by the survey and location thereof made for D. and others, contained 187½ acres ; the one intending to sell, and the other believing that he was buying, the lots as thus surveyed. It turned out, that in making such survey and location, the surveyor had extended and marked his line beyond the true boundary of the tract he was laying out, and had thereby included 43½ acres in D.'s two lots, to which he never had any right or claim.—*Held*, that this was a case of mutual mistake. That the deficiency was not in the subject matter of the contract, for that was the two lots as marked and surveyed for D. ; but that the difficulty was in giving title to that subject matter.

Where commissioners appointed by a statute to survey and divide a tract of land, run out and marked the boundary of one of the divisions on the land itself, at a distance of ten chains from the place where they laid it down and described it as being situated on their map and field notes ; the division is limited to the line actually marked by the commissioners, and cannot be extended to the line intended as shown by the map.

Equity will not compel a purchaser to take land which is involved in a doubtful and disputed question of boundary.

The vendee who has assigned his contract, is a proper party in a suit by his assignee against the vendor, for a specific performance ; but if he be omitted, and no objection be raised till the hearing, the court will direct a decree, on his executing and filing an assent and agreement in proper form, to be bound by the decree.

Poughkeepsie, July 31, August 1 ; August 17, 1846.

This was a bill for specific performance, filed October 17th, 1845, by Francis C. Voorhees and his partners, against Nicholas De Myer. The bill stated that in May, 1817, De Myer claiming to be the owner in fee of 187½ acres of land in the town of Lexington, in the county of Greene, in the Hardenburgh Patent, agreed to sell the same to William Griffin, for four dollars per

acre.   That thereupon a contract in writing, was executed be-
tween them in the words following :

" Nicholas De Myer of Kingston, agrees to sell and convey to
William Griffin of the town of Middletown, Delaware county;
lot number nine and eleven, in number twenty, in great lot num-
ber thirty-four, one hundred eighty-seven acres and one-half, for
seven hundred and fifty dollars, to be paid in five years from this
date, in equal annual payments, together with the interest of the
whole on each payment until paid.   The deed to be delivered
on payment of one-half of the purchase money, and satisfactory
security given for the remainder.   And for the true performance
of this agreement, the parties bind themselves in the penalty
sum of one thousand dollars, as witness our hands this 30th day
of May, 1817.

<div style="margin-left:2em">Witness present,              NICHS. DE MYER,<br>
*Arrietta Kiersted.*           WILLIAM GRIFFIN."</div>

That there was a misdescription of the premises in the con-
tract, in this, that the lots intended to be sold are lots number
nine and eleven, in Division number thirty-four in Great Lot No.
20, in the Hardenburgh Patent.   That at the time of the con-
tract, the lands were wild, uncultivated, and covered with woods.

That Griffin entered upon a part of the lots, supposing there
was one hundred and eighty-seven and one-half acres in both,
(De Myer at the sale having shown him a map and survey of
lots 9 and 11, exhibiting that quantity,) soon after he bought them,
cleared up large portions of them, and erected a dwelling house,
barn, stable, fences, and other valuable improvements thereon,
and remained in possession of such part, and claiming all to
which De Myer had title, to the present time, and made pay-
ments to him almost every year, towards the purchase money,
until 1845, having paid in all, over $1550 to De Myer.

That about the time Griffin entered, one Garrison took pos-
session of forty-three and one-half acres, parcel of the one hun-
dred and eighty-seven and one-half acres, as located on De
Myer's map and survey of lots 9 and 11, and Garrison and those
under him, have ever since been in possession of the forty-three

and one-half acres, claiming the same under a title adverse to that of De Myer.

That on learning of. this claim, and that De Myer had no title to the forty-three and one-half acres so sold to him as a part of lot 11, Griffin apprised De Myer of the possession and claim of Garrison, but the former never took any measures to assert or maintain his title thereto. Griffin never took or had possession of the forty-three and one half acres, and De Myer never had any title to or interest in it, or any authority to sell the same.

That about twenty years ago, a controversy having arisen between some of the proprietors of the subdivisions of Great Lot No. 20, as to the true boundary lines of the Divisions, (one of which was No. 34,) many of the proprietors of No. 34, having the same title and from the same source as De Myer, after investigating the matter, relinquished all claim to go beyond a certain commissioner's line run before 1800, and which line cuts off from the lots 9 and 11, as sold by De Myer, the same forty-three and one-half acres held by Garrison.

The bill then sets forth, that in April, 1845, the complainants recovered a judgment in the supreme court against Griffin, on which they had an execution issued and returned unsatisfied, and being about to file a creditor's bill, Griffin executed to them an assignment of his contract with De Myer.

Previous to this, with a view of securing them, Griffin had applied to De Myer for a deed of the premises sold to him, who refused to give it unless Griffin would pay the whole purchase money expressed in the contract, and on receiving the deed, would release the forty-three and one-half acres.

The complainants notified De Myer of the assignment to them, and renewed the application for a conveyance, with the same result.

The bill prayed for a specific performance, and for an abatement of the price *pro rata*, if De Myer should be unable to give to the complainants a good title to the forty-three and one-half acres.

The answer of De Myer, stated that at the time of the sale, he and his wife claimed to be seised in fee of lots 9 and 11, in right of his wife. That the price for which he sold the lots, was

the gross sum of $750, without reference to the precise number of acres, and that he did not sell them by the acre. That he did not produce to Griffin at the sale, or at any time, a map or survey of the lots. That he then supposed and still believes the lots contained one hundred and eighty-seven and one-half acres; and Griffin entered on all of the land he chose, and might have entered and possessed the whole one hundred and eighty-seven and one-half acres. That Griffin was bound to take and maintain possession of the whole; that he did not inform the defendant of Garrison's claim or possession within twenty years of the time he alleges such possession was taken; and if by Griffin's omission to take possession of the whole premises, any part of them is now held adversely or by a title growing out of Garrison's claim, Griffin and his assignees must be the sufferers, and not the defendant. And the defendant denied that any adverse possession under claim of title had ever been taken or maintained of the forty-three and one-half acres. The defendant was ignorant of the alleged investigation of proprietors under the same source of title, as to the boundary lines of the Division No. 34 of Great Lot No. 20, and he never acquiesced in their conclusion. When the applications were made for a conveyance, the defendant was ready and offered to convey, on receiving the balance of the purchase money due on the contract, but would not by his deed, warrant that lots 9 and 11 contained one hundred and eighty-seven and one half acres, or convey them by a special description which would include the lands possessed and claimed by or under Garrison.

That he has not done or suffered any act by which the title of himself and his wife to the whole of the one hundred and eighty-seven and one half acres, has been impaired or affected; and they have a good title to the whole.

In other respects the answer admitted the statements of the bill, except as to the judgment and proceedings thereon, which were regularly proved.

Issue being joined on the answer, both parties took testimony. The evidence is in part, to be found in the opinion of the court.

The defendants read in evidence an act of the legislature,

passed March 29, 1790, appointing Christopher Tappen and James Cockburn, commissioners for making a survey and running the lines of various tracts of the Hardenburgh Patent; and amongst other duties, they were to survey and divide Great Lot No. 20, and three other lots, according to a division thereof made by Ebenezer Wooster in 1749, and they were to mark on their map, the names of each heir of the then former owner, for whom Wooster had marked the same.

These commissioners on the 8th of March, 1791, filed in the clerk's office of the county of Ulster, a map of the lands surveyed and divided by them pursuant to the statute appointing them, and their minutes containing the field notes and descriptions of the lots and subdivisions. By this map and description, division number 34 in Great Lot 20, is laid out as being 72 chains and 47 links wide at the east end, and 72 chains 44 links wide at its west end; and division No. 35 lying next north of No. 34, is laid out as being 72 chains and 46 links wide at its east end and 72 chains and 44 links wide at its west end ; and several divisions of the same Great Lot correspond in width with these; all being 280 chains in length from east to west.

JAMES COCKBURN, a witness for the defendant, who was seventy-one years of age, a nephew of the commissioner named in the act of 1790, and a brother of the defendant's wife, and who formerly was the owner of lands under the same title in division No. 34; testified that in 1811 or 1812, he subdivided division lot No. 34 into sixteen lots, and laid out the lots in question, No. 9, containing forty-five and one fourth acres, and No. 11, containing one hundred and forty-two and one fourth acres, the latter lying north of No. 9, and bounding on division 35. These small lots fell to Mrs. De Myer. He run the outer boundaries of division, No. 34, according to the map and description filed by the commissioners. He found the southwest corner, and starting from there found the southeast corner at the proper place then run the east line, and found no corner, but taking the commissioners distance, he then run the north line the required length, and found a corner within about two and a half chains of where he came out on the west line. He found that two lines had been run and marked for the north line of No. 34, one was about 62

chains from the south line, the other was 75 chains from that line. In subdividing it, he took neither, but run a line at the distance of 72 chains 47 links as called for by the commissioners map. The owners and settlers on division No. 35, pretend that their lands run in upon No. 34, some ten or twelve chains, and there is a gore thus made which has sometimes been in dispute. The disputes arose after the witness run and marked his line, and before 1820.

The complainants proved that Griffin had cleared a hundred acres of the land bought of De Myer, fifteen years ago or more. A surveyor proved that lot 11 contained 100 acres to the line of the gore ; and its lines, extended across the gore to the line of division No. 34, as run by Mr. Cockburn in 1812, would include thirty-nine and 68-100ths acres in addition. The possession of this last parcel by persons claiming it, as stated in the bill, was proved, and that it was cleared at or before the time Griffin bought. Several witnesses who had resided near the premises or known them from twenty-five to forty years, testified to the existence of the marked line of trees which Mr. Cockburn found at the south side of the gore, and that it was regarded by the old settlers as the division line between the large divisions 34 and 35. The marks on the trees were described as appearing in. 1820, to have been made several years, and the bark had partly grown over them. At some time between 1816 and 1820, two surveyors named Tappen, run the south line of the gore, as being the line between divisions 34 and 35, and marked the trees on that line. The line of marked trees found there by Mr. Cockburn, extended the whole length of the division or lot No. 34.

*J. O. Linderman,* for the complainants.

*M. Schoonmaker,* and *J. Van Buren,* for the defendant.

THE ASSISTANT VICE-CHANCELLOR.—The objection that William Griffin ought to have been a party to the suit, was made for the first time at the hearing. It therefore came too late, if a perfect decree can be made between the present parties ; and if

Griffin be an indispensable party to a decree between them, the court will direct the cause to stand over so that he may be made a defendant. It is clear that he may be a party with propriety, and if the complainants prove to be entitled to relief, the decree may provide for bringing Griffin into the suit.

On the merits of the case, it seems to me to be an important question whether the subdivision 11 in lot 34, did or did not include the gore, as it is called, lying northerly of Griffin's possession. The north line of the subdivision is the north line of lot 34, and cannot extend beyond the latter. Where then was the north line of lot 34 ?

As I understand the private act of 1790, under which Great Lot No. 20 was run out and subdivided, it was the duty of the commissioners to mark the division lines. If so, and they performed that duty, there must have been a line designated and marked through the forest in 1790 or soon after, as and for the north line of this subdivision 34.

. When Mr. Cockburn, the witness, proceeded in 1811 or 1812, to subdivide lot 34 into smaller lots, he found two lines marked on its north side, neither of which corresponded with the required distance from the south line as laid down in the commissioners survey and map. The most southerly of the two lines found by Cockburn, is the south line of the gore, and corresponds with the north line of Griffin's possession. But this falls ten chains short of the distance on the commissioner's map. The other marked line was two and a half chains beyond that distance. He found no line at the proper distance, nor any marked corner at the northeast corner; but at the northwest corner, at a point one or two chains from where he came out in running the north line at the proper distance, he found the corner as marked by the commissioners.

It does not appear that this corner corresponded with the northerly marked line, and it could not have corresponded with the other. The southerly line which Mr. Cockburn found, must have been there before the Tappen's run their line as mentioned by the witness Van Valkenburgh; for that was about the time Griffin entered into possession. The Tappen's must therefore

have run upon the line which Cockburn saw in 1811 or 1812, and marked more trees to designate it.

Now Mr. Cockburn, as a surveyor, residing in that region of country, must have known at that time, whether the southerly line which he found was an old line or not ; whether it had been marked twenty years, or only two or three years before. And his silence as to the character of both lines in this respect, is singular. Again, he was a party interested in maintaining the line as far north as possible, yet he did not adopt the northerly line which he found marked ; and this shows clearly that he did not in 1811, deem that to have been the line marked by the commissioners.

Garrison took possession of the gore from Brooks in 1820, and he testifies that there was then a line of marked trees on the south line of the gore, which had apparently been made some years before, and the bark of the trees had partly grown over the marks on them. This, from the description of the witness, must have been the same marked line that Cockburn saw eight or nine years before ; and the growth of the bark over the marks, much strengthens the presumption that it was the line originally run by the commissioners.

It certainly makes it so very doubtful whether lot 34 as laid out, ever actually included the gore, that this court will not compel a purchaser to take the title to it from one whose claim is limited to the north boundary of that lot.

The line marked by the commissioners, must of course control the extent of the lot, and it cannot be carried beyond that line by the courses and distances contained on their map. ( *Van Wyck* v. *Johnson*, 18 Wend. 157.)

It is possible that some light might be thrown upon the point, by extending a survey across subdivision 35. Still, if the north line of 35 shall be found to correspond with that laid down by the commissioners on their map, and by some error of theirs, such as counting 72 chains when they had run only 62, they marked and established by monuments, the north line of subdivision 34 ten chains south of where it should have been ; there is no remedy for it, and number 34 must continue to be 62 chains wide, while 35 will retain its enhanced width of 82 chains.

The locality of this line was distinctly in issue, and I must presume that the parties exhausted their testimony in regard to it. If any witness could have aided the defendants, it was Mr. Cockburn, whose testimony I have already examined. I feel impelled, therefore, to decide upon the locality, as between these parties, and my opinion is clear, that the south line of the gore was the original north line of lot number 34 as actually marked and designated by the commissioners. The lot 11, as owned by the defendant and his wife, is necessarily bounded upon this line, and the defendant is not able to give to the complainants a title to the gore in question.

This being the result, it is next contended on the part of the defendant, that the contract was for the sale of lot 11, whatever its contents might be, and that the expression, " one hundred and eighty-seven and one-half acres," was mere description. In considering this point, it must be observed that this is an executory contract between the parties.

The bill charges, that previous to the bargain, the defendant exhibited to Griffin a map showing the lots 9 and 11, and that as they were there laid down, they contained one hundred and eighty-seven and one-half acres. This is denied by the answer, and it is not proved. But what are we to infer from the contract itself, with the surveys and descriptions ? The defendant contracted to sell to Griffin, " lot number nine and eleven in No. 20, in great lot No. 34, one hundred eighty-seven acres and one-half, for seven hundred and fifty dollars." This is a contract for the two lots, for a gross sum, or *per aversionem*, as it is in the civil law ; but what was the intention of the parties ? Was there a mutual mistake, or was there a misrepresentation ? Of the latter I find no proof. But I think there is sufficient evidence of a mistake.

If Griffin, after ascertaining the defendant's terms, had gone to examine the land, he would have found lots 9 and 11, as laid out by Cockburn in 1811 or 1812, containing one hundred and eighty-seven and one-half acres. He would not have been led to examine the lines of lot 34, for the description which he had received designated lots 9 and 11 as subdivisions of lot 20, instead of 34. Now I am to presume that Griffin either did exam-

ine before contracting, or satisfied himself from the statements of others, who as he supposed had examined, or otherwise knew the two lots.

So the defendant undoubtedly supposed these two lots run across what is called the gore, and embraced the one hundred and eighty-seven and one-half acres. If he had ever visited them, he would have found them so marked on the ground. If he took his information from Cockburn's subdivision of lot 34, he found the two lots laid out by metes sufficient to contain one hundred and eighty-seven and one-half acres. His whole idea of the lots, and his information concerning them, necessarily rested on Cockburn's survey, because the lots originated in his survey and subdivision. That he understood and believed the two lots to contain the full quantity, is further proved by his subsequent assertion, from time to time, that lot 11 extended across the gore.

The case then, upon the contract itself and the several surveys, is this. The defendant and Griffin, dealing in respect of lot 11, proceeded upon Cockburn's survey and location of the lot, by which it contained one hundred and forty-two and one-fourth acres. The one intended to sell the lot as laid out and marked by Cockburn, and the other supposed that he was buying the lot so marked; which truly contained the quantity of one hundred and forty-two and one-fourth acres. On completing the contract, it turns out that Cockburn in running this lot 11, extended it so much farther north than he should have done, as to include forty-three and one-half acres on the lot 35, and the defendant never had any right or claim to those forty-three and one-half acres.

This is a plain instance of mutual mistake. The lot 11 for which Griffin contracted, was the one laid out by Cockburn. The lot 11, which the defendant is able to convey, is the same lot as Cockburn should have laid it out, bounded on the north by the lot 35. The deficiency is not in the subject matter as described in the contract, for Cockburn's lot 11 as he marked it, holds good as to quantity. The difficulty is in giving title to that subject matter.

This frees the case from the bearing of the authorities cited

by the defendant, to show that where a definite lot is conveyed stating the number of acres, the latter is merely descriptive, and the boundaries of the former must govern, whether they contain a greater or a less quantity of land.

The complainants, as assignees of the contract, are entitled to a decree for its performance, so far as the defendant can make a title. And for the forty-three and one-half acres, to which he cannot convey a good title, there must be a rateable deduction from the price. This deduction should be made at the outset, and interest computed upon the balance, and the payments applied accordingly.

To obviate the delay of making Griffin a party, the complainants may file his assent under seal, duly acknowledged, to be bound by the decree. This consent should be recited in the decree and enrolled with it.

The decree may also declare that the title of the defendant and his wife to the land in the gore, is not to be affected by it, for any purpose other than the performance of this agreement. If the parties can agree upon the computation, a reference will be unnecessary.

As to the costs, there has been a mistake common to all the parties, and neither of them appears to have arrived at a correct view of the facts till since the litigation commenced. I think it is just to give no costs to either against the other, up to the entry of the decree.

If Griffin declines to execute the consent, the complainants may make him a party by a supplemental bill.(a)

---

(a) This decree was affirmed on appeal, by the Supreme Court in Equity, January, 1848.